No. 22-11036

_____

**In the**
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**In the Matter of Highland Capital Management, L.P.,**

*Debtor.*

**The Charitable DAF Fund, L.P.; CLO Holdco, Limited; Mark Patrick; Sbaiti & Company, P.L.L.C.; Mazin A. Sbaiti; Jonathan Bridges,**

*Appellants,*

*v.*

**Highland Capital Management, L.P.,**

*Appellee.*

_____

**In the Matter of Highland Capital Management, L.P.,**

*Debtor.*

**James Dondero,**

*Appellant,*

**v.**

**Highland Capital Management, L.P.,**

*Appellee.*

_____

**Appeal from the United States District Court**
**for the Northern District of Texas, Dallas Division**
*Honorable Brantley Starr, United States District Judge*
No. 3:21-cv-01974-X

_____

**BRIEF OF APPELLANT JAMES DONDERO**

_____

**Jeffrey S. Levinger**
jlevinger@levingerpc.com
**J. Carl Cecere (of counsel)**
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, Texas 75201
Telephone:  214-855-6817
Facsimile:  214-817-4509

*Attorneys for Appellant*
*James Dondero*

## CERTIFICATE OF INTERESTED PERSONS

No. 22-11036, *The Charitable DAF Fund, L.P., et al. v. Highland Capital Management, L.P.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Appellants:**

The Charitable DAF Fund, L.P.
CLO Holdco, Limited
Mark Patrick
Sbaiti & Company PLLC
Mazin Sbaiti
Jonathan Bridges
James Dondero

**Counsel for Appellant Dondero:**

Jeffrey S. Levinger
J. Carl Cecere
Levinger PC
1700 Pacific Ave., Suite 2390
Dallas, TX 75201

**Counsel for Other Appellants:**

Mazin A. Sbaiti
Jonathan Bridges
Sbaiti & Company PLLC
JPMorgan Chase Tower
2200 Ross Avenue
Suite 4900W
Dallas, TX 75201

Erik S. Jaffe
Brian J. Field
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006

**Appellee:**

Highland Capital Management, L.P.

**Counsel for Appellee:**

Jeffrey N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl
   & Jones LLP
10100 Santa Monica Blvd.,
13th Floor
Los Angeles, CA 90067

Roy T. Englert, Jr.
Matthew M. Madden
Kramer Levin Naftalis
   & Frankel LLP
2000 K Street NW,
4th Floor
Washington, DC 20006

Melissa S. Hayward
Zachery Z. Annable
Hayward PLLC
10501 N. Central Expy,
Suite 106
Dallas, TX 75231

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

*Attorney of Record
for Appellant James Dondero*

## REQUEST FOR ORAL ARGUMENT

Pursuant to 5TH CIR. R. 28.2.3, Appellant James Dondero requests oral argument. This is an appeal from an order of contempt that the Bankruptcy Court issued against Dondero, jointly and severally with co-appellants The Charitable DAF Fund L.P., CLO Holdco, Ltd., Mark Patrick, Sbaiti & Company PLLC, Mazin A. Sbaiti, and Jonathan Bridges. Given the sheer size of the $239,655 sanction, the depth of the factual record, which runs more than fifty volumes, and the significance and complexity of the legal and factual issues involved in this case, Dondero believes that oral argument will significantly aid the Court's decisional process.

TABLE OF CONTENTS

Certificate of Interested Persons .................................................i

Request for Oral Argument................................................... iii

Table of Authorities ............................................................vi

Issues Presented ................................................................xi

Introduction....................................................................1

Statement of the Case..........................................................2

I.    Factual History...........................................................2

      A.    Highland and the UCC seek to squeeze out Dondero and have him
            replaced by one of Highland's independent directors, James Seery. ..3

      B.    The Bankruptcy Court enacts gatekeeping orders that require any
            "entity" to obtain Bankruptcy Court permission before
            "commenc[ing] or "pursu[ing]" claims against Seery........................4

      C.    DAF and CLO Holdco challenge the HarbourVest Settlement in the
            Highland District Court Action. ..........................................4

      D.    DAF seeks District Court approval to add Seery to the Highland
            District Court Action. ...................................................5

II.   Procedural History .......................................................6

      A.    Highland pursues contempt sanctions for the Seery Motion—but
            not against Dondero..........................................................6

      B.    Highland shifts its focus to Dondero. ....................................8

      C.    The Bankruptcy Court improperly holds Dondero in contempt
            for "sparking" DAF's  attempt to bring an action against Seery.
            ...........................................................................11

      D.    The District Court largely affirms the Bankruptcy Court's
            contempt order, while supporting it with a new and invalid
            rationale. ................................................................13

Summary of the Argument .......................................................................... 14

Argument ..................................................................................................... 18

**I.**    Standard of Review .......................................................................... 18

**II.**   The contempt order against Dondero must be reversed because he never received the notice that Due Process requires before being sanctioned for contempt. ................................................................................... 18

**III.**  The contempt order against Dondero must also be reversed because he did not violate the gatekeeping order. ............................................. 23

**IV.**   The amount of the contempt sanction—$239,655—is excessive and impermissible. ................................................................................... 32

   A.    The award vastly exceeds what is necessary to compensate Highland for the legal fees occasioned by an alleged violation of the gatekeeping order. ................................................................. 32

   B.    The contempt sanction is impermissibly punitive. ............................ 34

   C.    The amount of the contempt sanction is also unreasonable. ............. 36

Conclusion ................................................................................................... 38

Certificate of Service .................................................................................. 39

Certificate Regarding Privacy Redactions and Virus Scanning ............... 39

Certificate of Compliance With Type-Volume Limit ............................... 40

## TABLE OF AUTHORITIES

**Cases**

*Alberti v. Klevenhagen,*
  46 F.3d 1347 (5th Cir. 1996).................................................................36

*Black v. SettlePou, P.C.,*
  732 F.3d 492 (5th Cir. 2013)................................................................36

*Brotherhood of Locomotive Firemen v. United States,*
  411 F.2d 312 (5th Cir. 1969)................................................................20

*Certain Underwriters at Lloyd's of London* v. *C.A. Turner Constr. Co.,*
  112 F.3d 184 (5th Cir. 1997)................................................................24

*Clark v. Boynton,*
  362 F.2d 992 (5th Cir. 1966)................................................................33

*Cook v. Ochsner Found. Hosp.,*
  559 F.2d 270 (5th Cir. 1977)................................................................34

*Cooter & Gell v. Hartmax Corp.,*
  496 U.S. 384 (1990) ............................................................................18

*Dole Fresh Fruit Co. v. United Banana Co.,*
  821 F.2d 106 (2d Cir. 1987).................................................................21

*Drummond Co. v. Dist. 20, United Mine Workers,*
  598 F.2d 381 (5th Cir.1979).................................................................18

*Gompers v. Buck's Stove & Range Co.,*
  221 U.S. 418 (1911) ............................................................................32

*Goodyear Tire & Rubber Co v. Haegar,*
  581 U.S. 101 (2017) ............................................................................32

*Hornbeck Offshore Servs., L.L.C. v. Salazar,*
  713 F.3d 787 (5th Cir. 2013)................................................................18

*In re Bradley,*
  588 F.3d 254 (5th Cir. 2009)................................................................18

*In re Highland Capital Mgmt., L.P.,*
   No. 20-03190-sgj11, 2021 WL 2326350 (Bankr. N.D. Tex. June 7, 2021) ......2, 3

*In re Hipp, Inc.,*
   895 F.2d 1503 (5th Cir. 1990)................................................................32

*In re Oliver,*
   333 U.S. 257 (1948) ...........................................................................19

*Lamar Fin. Corp. v. Adams,*
   918 F.2d 564 (5th Cir. 1990)......................................................... 34, 35

*Matter of Skyport Glob. Commc'ns, Inc.,*
   661 F. App'x 835 (5th Cir. 2016) (per curiam) ....................................34

*Oaks of Mid City Resident Council v. Sebelius,*
   723 F.3d 581 (5th Cir. 2013)................................................................29

*Orduna S.A. v. Zen–Noh Grain Corp.,*
   913 F.2d 1149 (5th Cir. 1990)..............................................................31

*Payne v. Univ. of S. Miss.,*
   681 F. App'x 384 (5th Cir. 2017) (per curiam) ....................................37

*Petroleos Mexicanos v. Crawford Enters., Inc.,*
   826 F.2d 392 (5th Cir. 1987).............................................................x, 36

*Pigrenet v. Boland Marine & Mfg. Co.,*
   631 F.2d 1190 (5th Cir. 1980)..............................................................31

*Ravango Americas L.L.C. v. Vinmar Int'l Ltd.,*
   832 F. App'x 249 (5th Cir. 2020) (per curiam) ....................................32

*Regal Knitwear Co. v. NLRB,*
   324 U.S. 9 (1945) ...............................................................................25

*Remington Rand Corp.-Delaware v. Bus. Sys., Inc.,*
    830 F.2d 1256 (3d Cir. 1987)...............................................................19

*Roussell v. Brinker Intern., Inc.,*
   441 F. App'x 222 (5th Cir. 2011) (per curiam) ....................................37

*Travelhost, Inc. v. Blandford,*
  68 F.3d 958 (5th Cir. 1995)........................................................ 23, 25, 28

*Waste Mgmt. of Wash., Inc. v. Kattler,*
  776 F.3d 336 (5th Cir. 2014)........................................................ 19, 20

*Wegner v. Standard Insurance,*
  129 F.3d 814 (5th Cir. 1997)............................................................37

**Rules**

5TH CIR. R. 28.2.3 ........................................................................ iii

FED. R. BANK. P. 7065 ....................................................................25

FED. R. CIV. P. 65 ..........................................................................25

FED. R. CIV. P. 65(d)(2)(A)-(C).........................................................25

FED. R. CIV. P. 65(d)(2)(B) ..............................................................30

**Statutes**

15 U.S.C. § 18-b(2)........................................................................5

28 U.S.C. § 157(a)-(b) ....................................................................x

28 U.S.C. § 157(b)(2)(A) .................................................................x

28 U.S.C. § 157(b)(2)(O).................................................................x

28 U.S.C. § 158(a)(1).....................................................................x

28 U.S.C. § 158(d)(1)......................................................................x

28 U.S.C. § 1291 ...........................................................................x

28 U.S.C. § 1292 ...........................................................................x

28 U.S.C. § 1331 ...........................................................................x

28 U.S.C. § 1334(a) .......................................................................x

**Other Authorities**

11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE
§ 2956 (3d ed.)........................................................................................25

## JURISDICTIONAL STATEMENT

This case originates from a contempt order issued on August 4, 2021 in the Chapter 11 bankruptcy proceeding of Highland Capital Management, L.P. (ROA.577 [RE 4]) The Bankruptcy Court had jurisdiction over the Chapter 11 proceeding under 28 U.S.C. §§ 157(a)-(b), 1331, and 1334(a). And the contempt proceeding was a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

Because the contempt order imposes monetary sanctions, it was final and appealable. *Petroleos Mexicanos v. Crawford Enters., Inc*., 826 F.2d 392, 398, 400 (5th Cir. 1987). On August 16, 2021, Dondero timely filed his notice of appeal of the contempt order to the District Court (ROA.569), which had jurisdiction over the appeal under 28 U.S.C. § 158(a)(1). The District Court issued a memorandum opinion and order resolving the appeal on September 28, 2022. (ROA.12255 [RE 3]) Dondero timely appealed that order to this Court on October 27, 2022 (ROA.12290 [RE 2]), and this Court has jurisdiction over the appeal under 28 U.S.C. §§ 158(d)(1) and 28 U.S.C. §§ 1291-1292.

## ISSUES PRESENTED

In addition to the issues and arguments presented in the brief filed by Appellants The Charitable DAF Fund L.P., CLO Holdco, Ltd., Mark Patrick, Sbaiti & Company PLLC, Mazin A. Sbaiti, and Jonathan Bridges (the "DAF Appellants"), which are adopted herein by reference as permitted under FED. R. APP. P. 28(i), Appellant James Dondero presents the following issues:

I.     Did the Bankruptcy Court err in imposing, and the District Court err in affirming, a contempt sanction against Dondero when he was given no notice in either the motion for contempt filed by Highland Capital Management, L.P. or the Bankruptcy Court's show-cause order that he would personally be at risk of a contempt sanction?

II.    Did the Bankruptcy Court err in imposing, and the District Court err in affirming, a contempt sanction against Dondero for violating the gatekeeping provision of the order appointing James Seery as CEO of Highland, which prohibited any "entity" from "commenc[ing]" or "pursu[ing]" any claim against Seery without Bankruptcy Court approval, when:

   a.     Dondero is not among the "entities" covered by the order;

   b.     no action against Seery was ever "commenced"; and

   c.     Dondero never "pursued" any claim against Seery on his own, and the Bankruptcy Court acknowledged that Dondero had no "involvement" with the entities that were accused of doing so?

III.   Did the Bankruptcy Court err in imposing, and the District Court err in affirming, an attorney's fee award for the alleged violations of the gatekeeping provision of the Seery order, when:

   a.     the fees were not related to losses actually incurred by Highland or Seery, but instead resulted from Highland's effort to pin the responsibility on Dondero for DAF's motion for leave to sue Seery;

   b.     Highland's effort to pin responsibility on Dondero, and the excessive fees it expended in pursuit of that effort, made the award unduly punitive and criminal, and therefore beyond the Bankruptcy Court's power to impose; and

c.     Highland offered no proof of the reasonableness of the fees it sought?

**INTRODUCTION**

When the Bankruptcy Court imposed the "gatekeeping" order at the heart of this case, which arises from the Chapter 11 reorganization of Highland Capital Management, it was meant to protect Highland's new CEO, James Seery, who was appointed during the bankruptcy, from "potentially vexatious, distracting litigation" that "might interfere with the reorganization." (ROA.583) Yet Highland would later weaponize that order to punish James Dondero, Highland's former CEO, simply for asserting his own competing plan for reorganizing the Highland organization, and for supposedly spearheading a purported violation of the gatekeeping order—a violation he had literally nothing to do with and that caused no tangible harm to either Highland or Seery.

The gatekeeping order at issue prevented any "entity" from "commencing or pursuing" any claim against Seery without the Bankruptcy Court's permission. (ROA.1172) But Dondero was not among the "entities" covered under the order, nor was he among the "entities" Highland accused of violating it, which included one of many charitable trusts Dondero contributed to but does not run. Nor was Dondero among those entities' lawyers, directors, officers, shareholders, or employees. Dondero also had no right or ability to control those entities and force them to file the supposedly offending "claim." And that "claim" never actually "commenced"—it went no further than a motion for leave to amend that the District

Court denied the day after it was filed. Dondero did nothing to "pursue" a claim either—he merely consulted with those who filed the motion for leave. But Highland spent hundreds of thousands of dollars trying to pin the blame on Dondero personally for this short-lived, costless event. The Bankruptcy Court held him in contempt for supposedly "sparking" this effort despite acknowledging he had no involvement in it. And the Bankruptcy Court made him jointly and severally liable for the hundreds of thousands of dollars Highland spent in its zeal to pin the blame on him for this fruitless event. But Dondero did not engage in any contemptuous conduct, and the unduly punitive sanction was beyond the Bankruptcy Court's power to impose. It should never have been ordered by the Bankruptcy Court or affirmed by the District Court. And this Court should reverse it.

## STATEMENT OF THE CASE

### I.    Factual History

When Highland filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 16, 2019 (ROA.585), all stakeholders in the bankruptcy originally desired to keep Dondero at the helm of the company. They expected that having the "founder and 'face' behind the Highland brand" could be "value-enhancing" for the debtor and its creditors. *In re Highland Capital Mgmt.*, No. 19-CV-34054-sgj11, 2021 WL 2326350, at *3 (Bankr. N.D. Tex. June 7, 2021) Also, no one understood Highland better than Dondero, and his unique

understanding would be essential in managing the reorganization of Highland, an organization so massive as to "manage[] billions of dollars of assets" (ROA.585) and so sprawling as to encompass more than 2,000 non-bankrupt entities. *See In re Highland*, 2021 WL 23263510, at *3. Dondero's personal interests were also so aligned and intertwined with Highland's that the company made regular contributions to several charitable trusts that Dondero founded, including Appellant Charitable DAF Fund, L.P. ("DAF"), which has donated millions of dollars to charities such as the Family Place, Dallas Children's Advocacy Center, and the Center for Brain Health. (*See* ROA.12366) Yet Dondero soon faced resistance from the U.S. Trustee and the Highland Unsecured Creditor's Committee ("UCC") that made it impossible for him to continue running the company.

## A. Highland and the UCC seek to squeeze out Dondero and have him replaced by one of Highland's independent directors, James Seery.

The fault lines between Highland and Dondero were familiar ones in bankruptcy. On one side, Highland's creditors (and those aligned with them) wished to wind down Highland's operations and sell its assets to maximize their recovery. On the other side, Dondero wished to preserve those assets for investors, leaving a window open for a potential recovery through a new entity or one of his existing companies. *In re Highland*, 2021 WL 2326350, at *24.

Highland and others vehemently opposed Dondero's plan and his efforts to advocate for it, claiming they presented a conflict of interest. (ROA.586) To resolve

their concerns, and to expedite Highland's reorganization, Dondero agreed to resign as Highland's CEO and to have Highland placed under the control of a board of independent directors—one of whom, James P. Seery, eventually became CEO. (ROA.585-86)

**B.    The Bankruptcy Court enacts gatekeeping orders that require any "entity" to obtain Bankruptcy Court permission before "commenc[ing] or "pursu[ing]" claims against Seery.**

Both the order approving the settlement agreement by which Dondero was removed as CEO (the "Corporate Governance Order") and the order approving Seery's appointment as his replacement (the "Seery CEO Order") contained "gatekeeper" provisions that required parties to seek approval from the Bankruptcy Court before taking certain actions. (ROA.583, 1134-35, 1172) At issue in this appeal is the gatekeeping provision in the Seery CEO Order, which stated:

> *No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery* relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

(ROA.1172, emphasis added)

**C.    DAF and CLO Holdco challenge the HarbourVest Settlement in the Highland District Court Action.**

That gatekeeping provision became relevant only after Highland obtained

Bankruptcy Court approval for an improper self-dealing settlement with HarbourVest, one of its creditors. (ROA.6020) As part of that settlement, Highland purchased HarbourVest's interest in a managed fund called Highland CLO Funding, Ltd. ("HCLOF"). (ROA.6019-20) Highland was the advisor to HCLOF (ROA.6024, 6029), and DAF, through its ownership of Appellant CLO Holdco, Ltd. ("CLO Holdco") (ROA.578, 6024), also owned a substantial share of HCLOF (ROA.6024). But Highland failed to disclose to DAF and CLO Holdco that HarbourVest's interest was worth nearly double what Highland had paid for it, and Highland's purchase of that interest deprived DAF and CLO Holdco of an opportunity to purchase the interest for themselves. (ROA.6026, 6040)

DAF and CLO Holdco thereafter retained attorneys at the Dallas law firm of Sbaiti & Company PLLC and filed a complaint against Highland and two Highland-related entities in District Court (the "Highland District Court Action"), alleging that Highland had breached duties to them under the Advisor's Act, 15 U.S.C. § 18-b(2), *et seq.*, HCLOF's company agreements, and common law. (ROA.6029-43)

### D.    DAF seeks District Court approval to add Seery to the Highland District Court Action.

One week after filing the Highland District Court Action, and before Highland and its associated entities had been served, DAF filed a motion in the District Court seeking leave to amend the complaint to add Seery as a defendant (the "Seery Motion") because he was ultimately responsible for Highland's improper conduct in

the HarbourVest settlement. (ROA.6045-83) But the next day, the District Court denied the Seery Motion—before Highland had even filed a response to it—concluding that an amendment to add a new defendant was improper when the current defendants had not yet been "served" and "appeared." (ROA.3460) Neither DAF nor CLO Holdco pursued the matter further.

## II.    Procedural History

### A.    Highland pursues contempt sanctions for the Seery Motion—but not against Dondero.

Highland and Seery incurred no expenses or hardships as the result of the Seery Motion, which was dismissed before they could even react to it. Yet on April 23, 2021, a mere three days after the Seery Motion was filed, Highland filed a motion in the Bankruptcy Court seeking to have several parties held in contempt for filing the Seery Motion, claiming that it violated the gatekeeping provision in the Seery CEO Order. (ROA.1764 [RE 5])

The contempt motion gave Dondero no notice that Highland might seek contempt sanctions against him. Instead, Highland named several other individuals and entities, whom it labeled "the Violators," as those who might be guilty of contempt, including DAF, CLO Holdco, the Sbaiti firm and its attorneys, and any "persons who authorized" the entities "to file the Seery Motion." (ROA.1764-66) Dondero was not specifically included among these "Violators," as that term was defined in the contempt motion and the accompanying proposed order.

6

(ROA.1764, 1770, 1776) And Dondero had no reason to believe Highland might consider him to be among the "persons who authorized" DAF or CLO Holdco to file the Seery Motion, because he lacked the ability to "authorize" those entities to do anything.

As Highland was aware, although Dondero had founded DAF and contributed money to it over the years, DAF's operations were under the exclusive control of Mark Patrick, the managing member of DAF's general partner, Charitable DAF GP, LLC. (ROA.1334, 1362, 1380, 5879, 5897-5908, 5934) CLO Holdco, in turn, was under DAF's exclusive control. (ROA.5879, 5955) Under the Cayman Islands law governing both DAF and CLO Holdco, and DAF's limited partnership agreement, only Patrick, as the managing member of DAF's general partner, had the authority to control DAF, to conduct its business, or to commence litigation proceedings. *See* Cayman Islands Exempted Limited Partnership Act § 14(2) (*see also* ROA.5938-39, 11377-79)

Nor did the Bankruptcy Court provide any notice to Dondero that he might be subject to contempt sanctions in the order to show cause it issued on April 29, 2021, four days after Highland filed its motion. (ROA.2584 [RE 6]) That order adopted Highland's terminology, demanding that each of the alleged "*Violators*"—*i.e.*, "The DAF," "CLO Holdco," "Sbaiti & Co.," and "those persons who authorized The DAF and CLO Holdco" to file the Seery Motion—appear at a hearing to determine

whether the Bankruptcy Court should issue an order "holding each of the *Violators* in contempt of court." (ROA.2585, emphasis added) And while the show cause order also required Dondero to appear at the hearing, it did not mention him among the "Violators." Instead, it listed him separately, suggesting that he was *not* among the "Violators" who might be sanctioned, but would be appearing only as a witness. (ROA.2585)

### B. Highland shifts its focus to Dondero.

Once the Bankruptcy Court named Dondero in its order to show cause, Highland shifted its entire focus from establishing a violation of the gatekeeping order to obtaining contempt sanctions against Dondero personally. In a dispute the Bankruptcy Court called "simple," and in which "[t]here really is very little, if anything, in dispute" (because the Seery Motion either violated the gatekeeping order or it did not), Highland voluntarily racked up hundreds of thousands of dollars in attorney's fees attempting to pin the blame on Dondero for a motion he did not file, that was never actually commenced or pursued, and that caused Highland and Seery no tangible harm. (ROA.594, 11530)

During the next several weeks following the show-cause order, Highland engaged in extensive discovery, including depositions and document exchanges, all directed at Dondero's relationship to DAF and CLO Holdco and the extent to which he played any part in the filing of the Highland District Court Action and the Seery

Motion. (ROA.9761-11237)

Highland also devoted nearly the entirety of the June 8, 2021 contempt hearing to that same effort. But it ultimately proved fruitless. Highland called only two witnesses: Patrick and Dondero himself. (ROA.11332-11462)   And both confirmed that Dondero had only minimal involvement with the Highland District Court Action—and bore no responsibility at all for the Seery Motion on which Highland's contempt motion was based.

Patrick testified that it was he—not Dondero—who "caused" DAF to file the Highland District Court Action and the Seery Motion (ROA.11340-41, 11348, 11350), and that the "idea of filing this complaint originated with the Sbaiti firm," which was recommended to Patrick, not by Dondero, but by the general counsel of NexPoint Advisors, one of Dondero's companies (ROA.11341, 11343-44).

Indeed, Patrick confirmed that only he could initiate the filing of the Seery Motion, because, as the managing member of DAF's general partner, he was the sole person in control of DAF and CLO Holdco at the time the Seery Motion was filed. (ROA.11341, 11348-49, 11361, 11377) Accordingly, the decision to sue Seery came from Patrick—and could only come from him.  (ROA.11341, 11348-49)

Dondero similarly testified that he could not have ordered DAF to file the Seery Motion. He explained that he had no "decision-making authority" at the company (ROA.596), because he had no official role—he was not an employee,

officer, board member, or "authorized representative" of either DAF or CLO Holdco (ROA.11378, 11451). He instead served as a mere "investment advisor" for the entities' portfolio. (ROA.11425). Indeed, the Bankruptcy Court determined during the contempt hearing that Dondero's communications with the entities and their representatives were not covered by attorney-client or work-product privileges, precisely because he lacked any formal relationship with those entities. (ROA.11428-29)

Both Dondero and Patrick also confirmed that, as a practical matter, Dondero had little involvement with the Highland District Court Action, and even less to do with the Seery Motion. While Dondero acknowledged that he was the source of some of the factual information in the original complaint in the Highland District Court Action (ROA.11426), and Patrick confirmed that Dondero had "worked with the Sbaiti firm with respect to their investigation of the underlying facts" (ROA.11342), Dondero "didn't get directly involved" in deciding "who was specifically liable"— or "the tactics on who would be defendants and when or if other people would be added" (ROA.11448, 11450). And even this limited investigatory role ended when the Highland District Court Action was filed—and did not extend to the Seery Motion. (ROA.11451)

Dondero did acknowledge that he "[p]robably" was "aware that that motion was going to be filed," and had "talked" to Sbaiti concerning the Seery Motion about

"half a dozen times," but emphasized that he "wasn't involved in the ultimate decision" whether to sue Seery. (ROA.11448, 11451) Rather, it was Patrick who authorized the Seery Motion. (ROA.1348, 1350) And Highland elicited no testimony from any witness suggesting that Dondero ever had any plans for DAF to sue Seery, recommended that DAF sue Seery, or pressured anyone into suing Seery.

### C. The Bankruptcy Court improperly holds Dondero in contempt for "sparking" DAF's attempt to bring an action against Seery.

Despite this evidence (and the lack thereof), the Bankruptcy Court found Dondero in contempt anyway, along with "DAF, CLO Holdco, Sbaiti & Company, PLLC, its lawyers Jonathan Bridges and Mazin Sbaiti, [and] Mr. Patrick." (ROA.585 [RE 4]) The Bankruptcy Court accepted Patrick's testimony that he—not Dondero— "authorized the filing of the Complaint and the Seery Motion" (ROA.595), and that he—not Dondero—"retained the Sbaiti law firm" (ROA.595). The Bankruptcy Court also accepted Dondero's testimony that while he was the "founder and primary donor to DAF" (ROA.597), he did nothing more than bring "information" to Patrick, "work with the Sbaiti firm" on its "investigation of the underlying facts" "regarding the filing of the Complaint" in the Highland District Court Action, and "was not involved with the Seery Motion itself" (ROA.595, 597).

Yet the Bankruptcy Court still determined that this testimony amounted to "clear and convincing evidence" that Dondero was in contempt of the gatekeeping

11

provision in the Seery CEO Order.  (ROA.597) The Bankruptcy Court concluded that by bringing "the idea" of "the District Court Action" to Patrick "to essentially re-visit the HarbourVest Settlement and to find a way to challenge Mr. Seery's and the Debtor's conduct," Dondero "sparked" a "fire," knowing that "Patrick and Sbaiti & Company, PLLC were happy to take the idea and run with it" and that Patrick would "do something wrong" in pursuit of it—whether or not Dondero actually knew the Seery Motion would be filed. (ROA.597) The Bankruptcy Court also found that Patrick "basically abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and executing the litigation strategy" (ROA.597), even in the absence of evidence that Dondero had or exercised that supposed control over the litigation to authorize the Seery Motion. And thus the Bankruptcy Court concluded that Dondero could be held in contempt based on the Seery Motion, even though he took no overt act to commence or pursue it.  (ROA.597)

Based upon this unsupported contempt finding, the Bankruptcy Court decided to award monetary sanctions in order to "compensate the Debtor/estate for losses resulting from . . . non-compliance" with the gatekeeping provision. (ROA.600) But here the Bankruptcy Court overreached again, concluding that Highland should recover all of its attorney's fees "relating to this contempt matter" (ROA.604), although virtually *none* of those fees actually resulted from the contemnors' "non-compliance" with the Seery gatekeeping order itself, but instead stemmed from

Highland's effort to pin the blame for such non-compliance on Dondero. And the Bankruptcy Court erred again in calculating the amount of the recoverable fees. (ROA.604) It decided to award fees to Highland, the UCC, and local counsel, even though only "the Debtor presented invoices incurred by its counsel relating to this matter"(ROA.604)—and even though those invoices did not "reflect the fees and expenses incurred" at the contempt hearing. (ROA.605) The Bankruptcy Court therefore made "estimates" of these unsubstantiated fees, yielding the enormous sum of $239,655 for an alleged violation of a gatekeeping order that caused Highland or Seery no expense, inconvenience, or harm.  (ROA.605) And on top of that, the Bankruptcy Court "add[ed] on a monetary sanction of $100,000 for each level of [unsuccessful] rehearing, appeal, or petition for certiorari" that the condemners might choose to take with regard to the contempt order. (ROA.605-06)

> **D. The District Court largely affirms the Bankruptcy Court's contempt order, while supporting it with a new and invalid rationale.**

On appeal, the District Court overturned the "$100,000-per-appeal" penalty but affirmed the remainder of the Bankruptcy Court's contempt order. (ROA.12267, 12272 [RE 3]) But sensing the infirmity in the Bankruptcy Court's conclusions related to Dondero's contempt liability, the District Court was forced to replace the Bankruptcy Court's findings with its own, and thus introduced a new error. Whereas the Bankruptcy Court had accepted the undisputed testimony from Dondero and

Patrick about Dondero's lack of involvement in the Seery Motion, the District Court claimed to have found an inconsistency—which neither the Bankruptcy Court nor anyone else had identified—between Dondero's hearing testimony and the testimony he gave at a previous deposition. (ROA.12275, citing "Doc. No. 8-30 at 153" [ROA.7645]) And on the basis of this supposed "contradict[ion]," the District Court determined for itself that Dondero's testimony that he "did not suggest that Mr. Seery should be added as a defendant" and that he "had no involvement with the Seery Motion" was not "credible." (ROA.12275)

## SUMMARY OF THE ARGUMENT

The contempt order and sanction of $239,655 against Dondero must be vacated because they violate numerous fundamental restrictions on the imposition of contempt sanctions.

To begin with, the Bankruptcy Court's decision to hold Dondero in contempt cannot be squared with the basic requirements of Due Process. The Bankruptcy Court gave Dondero no notice that he might be held in contempt of the gatekeeping order before the court actually held him in contempt, thereby depriving him of an opportunity to prepare and present a defense against a contempt sanction with full knowledge of the risks he was facing. Both Highland's motion for contempt and the Bankruptcy Court's show-cause order provided that only certain persons and entities—labeled the "Violators"—were at risk of a contempt sanction. But Dondero

was not specifically labeled a Violator, nor did he fit within the unnamed class of persons included in that category. That class was restricted to those who "authorized" DAF and CLO Holdco to "file the Seery Motion." And Dondero had no reason to believe he might be included among them, because he lacked the power to authorize those entities to do anything, and never did order DAF or CLO Holdco to do anything. That power instead belonged exclusively to Mark Patrick, the managing member of DAF's general partner, who alone possessed the power to authorize those entities to bring suit against Seery and who also authorized the Seery Motion. Dondero therefore had no reason to believe he was at risk of contempt when he appeared at the contempt hearing as a witness. That basic failure to provide Dondero notice that he was among the accused alone requires reversing the contempt order.

The Bankruptcy Court's contempt finding against Dondero is equally insupportable on the merits. Dondero *could not* violate the gatekeeping order because that order restricted only "entities," not individuals, from commencing or pursuing a claim against Seery. And Dondero *did not* violate the gatekeeping order because he was two degrees removed from any conduct that might constitute "commencing" or "pursuing" a claim against Seery. The Seery Motion did not constitute "pursuit" of a claim against Seery because a party cannot "pursue" a claim, as that term is used in the gatekeeping order, before the claim is "commenced"—

and no claim was ever commenced against Seery. Dondero likewise did not "pursue" a claim against Seery because there is no evidence, much less the clear and convincing evidence required for contempt, that Dondero had any involvement with the decision to file the Seery Motion. He merely consulted with those who made the decision, and that cannot constitute conduct that clearly and convincingly violates any definite and specific term of the gatekeeping order.

Notably, the Bankruptcy Court accepted that Dondero did not commit any overt act that could constitute a violation of the gatekeeping order. But rather than refuse to sanction him, as it should have done, it tried to paper over that evidentiary gap in an effort that is both legally unjustified and factually insupportable. It is undisputed that Dondero did not "spark" the supposed "fire" of the Seery Motion— at most he may have initiated the idea of filing the Highland District Court Action, which never named Seery and was not the basis for Highland's contempt motion. But Dondero's prompting of one legitimate lawsuit cannot support liability for a later motion that Dondero did not initiate. So the Bankruptcy Court's rationale fails on its own terms. And the District Court's attempt to overcome the deficiencies in the Bankruptcy Court's decision only made things worse by violating one of the most fundamental rules of appellate law: Appellate tribunals cannot make credibility determinations.

The large monetary sanction that the Bankruptcy Court awarded presents a separate problem, violating fundamental rules for the imposition of attorney's fees as a compensatory sanction. Even if it were possible to find that Dondero had engaged in contemptuous conduct, the fee award issued by the Bankruptcy Court was manifestly improper. The Bankruptcy Court's decision to impose on Dondero a penalty in the hundreds of thousands of dollars for a motion that caused no harm to either Seery or Highland, and that was abandoned before it even started, was legally and factually impermissible. And that problem was only made worse by the fact that the amount of the sanction reflects hundreds of thousands of dollars in attorney's fees spent on a witch-hunt to pin the blame on Dondero.  Such an award was not designed to compensate. It was meant to punish, and therefore constituted the sort of criminal penalty that bankruptcy courts lack the power to impose. The Bankruptcy Court also erred by awarding these fees in the absence of any proof of their reasonableness. For these additional reasons, the sanctions award must be reversed.

## ARGUMENT

### I. Standard of Review

In an appeal from a contempt order issued by a bankruptcy court, the bankruptcy court's "contempt findings" and "assessment of monetary sanctions" are both reviewed for an abuse of discretion. *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013); *In re Bradley*, 588 F.3d 254, 261 (5th Cir. 2009). But such "review is not perfunctory." *Hornbeck Offshore*, 713 F.3d at 792. While this Court, "[l]ike the district court," reviews the "bankruptcy court's findings of fact for clear error," *In re Bradley*, 588 F.3d 254, 261 (5th Cir. 2009), "'the interpretation of the scope of the injunctive order[] is a question of law to be determined by the independent judgment of this Court.'" *Hornbeck Offshore,* 713 F.3d at 792 (quoting *Drummond Co. v. Dist. 20, United Mine Workers,* 598 F.2d 381, 385 (5th Cir.1979)). And a bankruptcy court will "necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990).

### II. The contempt order against Dondero must be reversed because he never received the notice that Due Process requires before being sanctioned for contempt.

The first and most basic problem with the Bankruptcy Court's contempt order is that Dondero received no notice that he *might* be sanctioned before he actually *was* sanctioned. Neither Highland's motion for contempt (ROA.1764) nor the

Bankruptcy Court's show-cause order (ROA.2584) specifically named Dondero among the so-called "Violators" who were at risk of being held in contempt. And Dondero had no reason to believe he fell into the class of "Violators" who faced potential contempt sanctions because only they could "authorize[] the DAF and CLO Holdco" to file the Seery Motion, whereas Dondero could not—and did not—authorize that filing. The failure to name Dondero in advance of holding him in contempt cannot be squared with fundamental Due Process requirements.

In the contempt context, Due Process requires that "one charged with contempt of court be advised of the charges against him," so that he might "have a reasonable opportunity to meet them by way of defense or explanation." *In re Oliver*, 333 U.S. 257, 275 (1948); *see also Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 339-40 (5th Cir. 2014). These Due Process protections apply regardless of "whether the contempt threatened is civil or criminal." *Remington Rand Corp.-Delaware v. Bus. Sys., Inc.*, 830 F.2d 1256, 1258 (3d Cir. 1987). And they require more than merely affording potential contemnors the opportunity for a hearing; potential contemnors must also understand that their liability for contempt might be determined as a result of that hearing. Accordingly, the notice required by Due Process "typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt." *Waste Mgmt. of Wash.*, 776 F.3d at 340.

These principles mean that a contempt sanction will not stand unless the parties who were sanctioned exactly match the parties who were given prior notice that they were at risk of being sanctioned, so that they may mount a defense to that charge. When a court issues a contempt sanction against a person who was not specifically mentioned in a previous show-cause order, the sanction against that person must be vacated. *See Remington Rand Corp.*, 830 F.2d at 1258 (reversing contempt finding and attorney's fees sanction because show-cause order directed to corporate debtors did not mention trustee who was actually sanctioned even when "[t]here is no question that [the trustee] had actual knowledge of the contempt proceedings against [the corporations]."). And when, as here, the court's show-cause order references a party's motion for contempt in order to identify the specific parties at risk of contempt, then the contempt order must be vacated if the motion did not specifically mention the person held in contempt. *See Waste Mgmt. of Wash*, 776 F.3d at 340 (vacating a contempt sanction when the court's show-cause order referenced a party's "motion for hearing" that failed to mention the contemnor); *Brotherhood of Locomotive Firemen v. United States*, 411 F.2d 312, 318-19 (5th Cir. 1969) (holding that contempt award must be vacated when the petition seeking contempt that led to show cause order "did not even name specifically 6 of the individual appellants and all 3 of the local lodges found in contempt.").

Importantly, vacatur of a contempt order is also required even when, as here, the unmentioned party is ordered to appear at the contempt hearing as a witness and actually shows up to testify. *See Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106 (2d Cir. 1987) (holding that contempt sanctions issued against corporate officers subpoenaed to appear as witnesses and within the scope of the injunction must be vacated when the court's show-cause orders were issued only against the corporate defendants). Accordingly, the Bankruptcy Court's failure to specify that Dondero was among the "Violators" who might be held in contempt—which in turn was based on Highland's failure to specify that Dondero was among those "Violators"—requires that the contempt order against him be vacated.

The District Court concluded otherwise, but its reasoning is unpersuasive. The District Court concluded that the term "Violators" was broad enough to include Dondero because "the show cause order didn't define 'violators,'" which to the District Court meant that the term "denoted the aforementioned individuals and entities" mentioned previously in the show-cause order, which included "DAF, CLO Holdco, [] Dondero" and others. (ROA.12278)  But the District Court overlooked the fact that the term "Violators" *was* a defined term—it was expressly defined in Highland's contempt motion. And the District Court elsewhere in its opinion acknowledged that "[t]he show cause order adopted the term 'violators' from Highland's contempt motion." (ROA.12280)

Nor did Dondero at any point "admit" to the Bankruptcy Court an "understanding" that he had been named in the show-cause order as a potential contemnor. (ROA.12278) On the contrary, Dondero consistently expressed his understanding that he *was not* included as a potential contemnor in that order—including in the passages from the record that the District Court emphasized to support this supposed admission. For example, the District Court pointed to various passages from a limited objection that Dondero filed in advance of the contempt hearing. (ROA.12277, citing 8-8 at 171 [ROA.2618]) But in a passage from that objection that the District Court disregarded, Dondero emphasized his understanding that he "was not included in the Debtor's Motion or proposed order" and thus could not be properly subjected to sanctions. (ROA.2620) And the District Court got the passage it quoted from that objection exactly backwards: The Court suggested that Dondero admitted "his understanding that he had been 'named by the Court as an alleged or implied violator'" (ROA.12278, quoting Doc. 8-8 at 171 [ROA.2618]), when in fact Dondero was actually "*object[ing]*" to any implication that he had been named by the Bankruptcy Court as "an alleged or implied violator" (ROA.2620).[1]

---

[1] Equally misplaced was the District Court's reliance on statements made by Dondero's counsel at the contempt hearing. (*See* ROA.12279, citing "Doc. No. 8-45 at 159-60" [ROA.11323-24] and "Doc. No. 8-46 at 150" [ROA.11518]) As Dondero's counsel explained, these statements simply reflected counsel's argument that Dondero should not be considered an "alleged violator" because he was not "a control or authorizing person"—and thus did not fit within the category of "Violators" covered by Highland's motion and the show-cause order. (ROA.12278)

The District Court therefore erred by misreading Dondero's effort to preserve his Due Process objections as concessions that no Due Process violation occurred. And the District Court likewise erred in concluding that the show-cause order actually named Dondero as a potential contemnor. Indeed, even if the show-cause order provided *some* inkling to the contrary, "an inkling is not enough to subject one to potential incarceration or monetary penalties." *Remington Rand Corp.*, 830 F.2d at 1258. For this reason alone, the contempt order against Dondero must be reversed.

## III. The contempt order against Dondero must also be reversed because he did not violate the gatekeeping order.

The Court should also reverse the contempt order against Dondero because Highland failed to meet its demanding burden to prove that he engaged in any contemptuous conduct. "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (internal quotation omitted). And "[i]n a civil contempt proceeding, the movant bears the burden of establishing the

---

The District Court misunderstood that argument, interpreting it as a contention that Dondero "was not *properly* before the court," rather than an argument that he had not "been *named* by the court as a violator." (ROA.12278) But it was actually the latter—the point being that if Dondero did not fit within the class of persons who "authorized" the Seery Motion, there was no way he could be considered a "Violator" at all.

elements of contempt by clear and convincing evidence." *Id*. (internal quotation omitted).

Highland could not meet that demanding standard to hold any of the appellants in contempt for all the reasons that the DAF Appellants have explained in Parts I and II of their brief, which Dondero adopts by reference as permitted under FED. R. APP. P. 28(i). But the contempt order against Dondero is particularly problematic because he is uniquely removed from the conduct that Highland alleged to be contemptuous, and uniquely incapable of violating the gatekeeping order. That order prohibited any "entity" from "commenc[ing]" or "pursu[ing]" any claim against "Mr. Seery relating in any way" to his role as Highland's CEO and chief restructuring officer without the Bankruptcy Court's approval. (ROA.1172) There is no evidence—much less clear and convincing evidence—that Dondero violated that provision of the gatekeeping order.

Indeed, Dondero was incapable of violating the Seery gatekeeping order because it did not cover him. The order was directed to "entities," not individuals, and therefore plainly does not apply to Dondero. The Bankruptcy Court obviously believed otherwise, but the mere fact that the Bankruptcy Court wrote the order does not make its interpretation determinative. Rather, the "plain meaning" of the order's terms governs. *Certain Underwriters at Lloyd's of London* v. *C.A. Turner Constr. Co.*, 112 F.3d 184, 186 (5th Cir. 1997). And under that plain meaning, the

gatekeeping order did not "requir[e]" that Dondero do anything. *Travelhost*, 68 F.3d at 961. It was simply inapplicable to him.[2]

Nor did Dondero violate the gatekeeping order because he neither "commenced" nor "pursued" any action against Seery. As the contemnors argued in the District Court, and the DAF Appellants argue in this Court, "commence" means "start," and is inapplicable to the facts of this case because no one actually started any claim against Seery. And "pursue" means to "prosecute or sue"—or to "carry it out or to follow it"—and therefore applies only to the "prosecution" or "carrying out" of actions that have already commenced. (ROA.12260; *see also* DAF

---

[2] Under FED. R. CIV. P. 65 (applicable in bankruptcy adversary proceedings under FED. R. BANK. P. 7065), an injunction issued against a "party" can be enforced against "agents" of the party and those acting in "active concert and participation" with that party. FED. R. CIV. P. 65(d)(2)(A)-(C). But none of the provisions in Rule 65 make the gatekeeping order applicable to Dondero. For one thing, an injunction issued against unnamed "entities" is not enforceable against a particular "party," as Rule 65 requires. And Dondero does not have any relationship to the "entities" at issue that would make the gatekeeping order enforceable against him under Rule 65. Indeed, the Bankruptcy Court held that Dondero is not an "agent" of DAF or CLO Holdco. (ROA.11428-29) Dondero also was not working in "active concert and participation" with those entities within the contemplation of Rule 65. That category is reserved for those "in privity" with the parties— those who are "so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding." 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2956 (3d ed.) That category is meant to capture situations in which a party restrained by an injunction tries to "nullify a decree by carrying out prohibited acts through aiders and abettors," *Travelhost*, 68 F.3d at 961 (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945))—using the non-party as a conduit to evade the injunction. It does not cover situations where the non-party merely consults with an agent of a party to the injunction and does not carry out any acts on the party's behalf.

Appellants' Br. at Part I) That means the gatekeeping order cannot apply to acts that merely led up to the commencement of a lawsuit—like a motion for leave to amend that was quickly denied.

The District Court agreed with the appellants that they never "commenced" an action to pursue any claim against Seery. (ROA.12259) But the District Court nonetheless concluded that they had "pursued" a claim against Seery by ascribing to that term a broad meaning—specifically, "'seeking' or 'trying' to obtain a desired end"—which it thought would apply to *attempts* to sue Seery that never came to fruition. (ROA.12260-61)

But the District Court's broad definition of the term "pursue" is legally incorrect, because determining the meaning of that term requires more than an abstract application of dictionary definitions. It requires determining how the word is used within the context of the gatekeeping order. And in that order, the term "pursue" comes *after* "commence," suggesting that it refers to an event that occurs *after* commencing—it therefore "pursuing" an action against Seery after that action had already commenced. That interpretation makes perfect sense, because it is one thing to start an action in violation of the gatekeeping order but quite another to continue prosecuting it. After all, the latter is not only more wrongful, and more contemptuous of the court's authority, but also is more likely to cause harm to the parties protected by the gatekeeping order.

In addition, the District Court's broad definition of "pursue" would lead to illogical results. For instance, under the District Court's reasoning, a party who considers suing Seery, and conducts enough research to determine that such a lawsuit would be inadvisable, would be in violation of the gatekeeping order because that party failed to ask the Bankruptcy Court for permission before pursuing that preliminary research. That outcome would be absurd and unfair. The District Court tried to avoid this obvious absurdity and inequity by cabining the breadth of its definition, suggesting that "pursue" means more than "try"—it means "trying" toward some specific aim. In its view, "[t]o pursue a claim, a party must 'try' or 'seek' to bring that claim." (ROA.12260) And it believed this cabining separated "[r]equesting leave to amend" from "legal research or client communications." (ROA.12260-61) But those situations remain inseparable despite the District Court's cabining: The party conducting the research in the example above had the aim of suing Seery, and it "tried" and "sought" to bring a lawsuit, before stopping just short of actually filing anything. So the absurdity remains. Only the plain meaning of the word "pursue," read in its proper context, avoids that absurd result. And adopting that plain meaning requires reversing the contempt order against Dondero.

Yet even if it were grammatically or contextually appropriate to give the term "pursue" the erroneously broad definition adopted by the District Court, it still does not apply to Dondero's conduct in this case. Even if "pursue" were synonymous with

"try," then Dondero still did not violate the gatekeeping order, because more than anyone else in this case, Dondero never even *tried* to sue Seery. Dondero himself never brought a claim against Seery—or even sought leave to do so. He did not join the Seery Motion, nor did he file it or even order that be filed. Indeed, the evidence is undisputed that Dondero was not involved with the decision to bring claims against Seery. (ROA.11447-48, 11451) He merely consulted with those who made that decision on their own. He therefore did not take "every action necessary" to bring a claim against Seery, as the District Court assumed other contemnors may have done. (ROA.12261)

Moreover, Dondero never had that "aim" at all, and he took no action toward fulfilling it. There is no evidence to the contrary. And if merely *consulting* with the decisionmakers of a party pursuing a claim constitutes "pursuit" of that claim, then the gatekeeping provision is even more impermissibly broad than the District Court assumed. Because that reading of the gatekeeping order would prohibit *even talking* with others about a claim against Seery, it would surely infringe upon First Amendment rights. For all these reasons, the gatekeeping order cannot be construed to have prohibited Dondero's conduct—and certainly not with the "definite[ness]" and "specifi[city]" required before a contempt order can be imposed. *Travelhost*, 68 F.3d at 961; *see also Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581,

585 (5th Cir. 2013) (a court order on which contempt is based must "neither vaguely nor ambiguously" require or prohibit conduct).

Notably, the Bankruptcy Court itself did not believe that Dondero actually "pursued" a claim against Seery under the contemplation of the gatekeeping order. To the contrary, it accepted Dondero's testimony that he had no "involvement" with the decision to file the Seery Motion, and therefore never "pursued" it. (ROA.597) Instead, the Bankruptcy Court held Dondero in contempt because *other* persons or entities "pursued" claims against Seery, on the theory that Dondero "sparked" the "fire" that eventually led to the filing of the Seery Motion, and had "control' over those who did so. (ROA.597) But Dondero's supposed *de facto* "control" over DAF and CLO Holdco cannot provide grounds to hold him in contempt in the absence of clear and convincing evidence that he ever *exercised* that alleged control to force them to seek to bring suit against Seery. And there is simply no evidence that he did so.

The only "fire" that Dondero even arguably "sparked" was the filing of the Highland District Court Action, which did not name Seery as a defendant and therefore was not claimed to be a violation of the gatekeeping order. (ROA.589) Dondero also took no overt action toward the filing of the Seery Motion, and he cannot be held in contempt based on the decisions of others to bring that motion— even if those decisions and actions violated the gatekeeping order. "*[A]ctive* concert

and participation" in another person's violation of a court order is required for contempt against the first person. FED. R. CIV. P. 65(d)(2)(B) (emphasis added). And in any event, the fact that the original action Dondero supposedly "sparked" *did not* name Seery as a defendant is powerful evidence that Dondero did not foresee, let alone intend to "spark," the filing of a motion seeking to add Seery as a defendant. Accordingly, the only inference supported by the evidence is that Dondero desired to "challenge Mr. Seery's and the Debtor's conduct" by bringing an action solely against Highland, concerning conduct for which Seery was involved. (ROA.597) That action does not violate any aspect of the gatekeeping order. There is therefore no evidence, much less clear and convincing evidence, to suggest that Dondero violated the gatekeeping order.

The District Court's effort to paper over these problems in the Bankruptcy Court's decision only created more problems. The District Court identified a supposed "contradiction" in Dondero's testimony that neither the Bankruptcy Court nor Highland ever identified, based on what the District Court saw to be a discrepancy between in the testimony Dondero gave during the contempt hearing and the answers he gave during a previous deposition. (ROA.12275, citing ROA.7645) And the District Court used that purported contradiction as justification to make its own fact findings regarding Dondero's "credib[ility]" that the Bankruptcy Court did not. (ROA.12275) But the supposed contradiction was

illusory. At one point during his deposition, Dondero testified that he "did not know that 'the Sbaiti firm intended to file a motion for leave to amend their complaint to add Mr. Seery.'" (ROA.12275, quoting ROA.7654)   Later in the deposition, however, Dondero stated that he could not specifically recall whether he had prior knowledge of the Seery Motion.   (ROA.7645-48) Dondero ultimately put this issue to rest in the contempt hearing when he testified that he "was aware that the motion was going to be filed." (ROA.12275, quoting 11451) So there is no "contradiction"—and mere knowledge is no basis for contempt.

But equally important, the District Court's entire excursion into Dondero's deposition was inappropriate. The District Court was not permitted to act as fact-finder—or cross-examiner—because it was presiding over the case as an appellate judge. "The credibility determination of witnesses, including experts, is peculiarly within the province of" the tribunal that hears the case. *Orduna S.A. v. Zen–Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990). A manifest injustice therefore occurs when a reviewing tribunal, whether it be an administrative law judge, a magistrate judge, a district court, or a court of appeals, resolves an appeal by making credibility determinations and deciding fact disputes on the basis of a cold record. *See Pigrenet v. Boland Marine & Mfg. Co.*, 631 F.2d 1190, 1191-92 (5th Cir. 1980). Accordingly, the District Court's effort to compensate for the Bankruptcy Court's

31

errors only injected more error, thus requiring reversal of the contempt order against Dondero.

## IV. The amount of the contempt sanction—$239,655—is excessive and impermissible.

Beyond the absence of support for the Bankruptcy Court's contempt order, the amount of the contempt sanction is also demonstrably excessive, lacking in evidentiary support and violating basic legal standards for contempt sanctions in numerous respects.

### A. The award vastly exceeds what is necessary to compensate Highland for the legal fees occasioned by an alleged violation of the gatekeeping order.

The Bankruptcy Court claimed that it was issuing a civil, compensatory contempt sanction (ROA.604), because "'bankruptcy courts do not have inherent criminal contempt powers'—they can only issue civil contempt sanctions" (ROA.12003, quoting *In re Hipp, Inc.*, 895 F.2d 1503, 1511 (5th Cir. 1990)). But even a compensatory fee award sanction must be "causally tied" to the contemnor's "misconduct," *Goodyear Tire & Rubber Co v. Haegar*, 581 U.S. 101, 105 (2017), meaning that "it must be 'measured in some degree by the pecuniary injury caused by the act of disobedience,'" *Ravango Americas L.L.C. v. Vinmar Int'l Ltd.*, 832 F. App'x 249, 255 (5th Cir. 2020) (per curiam) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 443 (1911)), and "must not exceed the actual loss to the complainant caused by respondent's violation of the decree plus complainant's

reasonable expenses … in presenting the contempt for the judgment of the court."
*Clark v. Boynton*, 362 F.2d 992, 993 (5th Cir. 1966) (internal quotation omitted).
But neither Highland nor Seery suffered any pecuniary injury or actual loss caused
by the filing of the Seery Motion. They were not even required to respond to that
motion, because the District Court denied it the day after it was filed and the movants
never re-urged it. (ROA.3460) Accordingly, the only legitimate compensatory
sanction would have been none at all. The Seery Motion was, at worst, a technical
violation of the gatekeeping order that was immediately and voluntarily abandoned
by those responsible for filing it—and did not cost anyone anything. Virtually none
of the $239,655 contempt sanction was compensation for injury.

Instead, nearly all of the sanction was attributable to Highland's pursuit of its
contempt motion, which at best was based on a costless, harmless, and technical
violation of the gatekeeping order. And hundreds of thousands of dollars of *that*
amount were spent with the sole object of pursuing Dondero for contempt after he
was named in the Bankruptcy Court's show-cause order as a person who was
required to attend the hearing. Those expenses cannot be traced to any "actual loss"
Highland or Seery sustained as the result of any contemptuous conduct, because no
recovery from Dondero was needed to make Highland and Seery whole. The other
alleged contemnors were more than capable of compensating for any losses, which
were non-existent.

In addition, Highland's reasonable costs in bringing its "simple" motion for contempt, in which "[t]here really is very little, if anything, in dispute" (ROA.594, 11530), should have been miniscule. The sole reason that Highland incurred attorney's fees of six figures was its gratuitous effort to discover irrelevant information and to pin the blame for the Seery Motion on Dondero—an effort brought out of spite simply to ensure he suffered some consequence for the filing of that motion and for opposing Highland's plan of reorganization. Accordingly, the sanction award eclipsed the "actual loss" occasioned by any contemptuous conduct resulting from the Seery Motion, and vastly exceeded the fees that would have been "'necessarily expended in bringing an action to enforce' the injunction." *See Matter of Skyport Glob. Commc'ns, Inc.*, 661 F. App'x 835, 841 (5th Cir. 2016) (per curiam) (quoting *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977)). That requires reversal of the sanction.

## B.   The contempt sanction is impermissibly punitive.

The Bankruptcy Court's contempt sanction also exceeded the court's power, because bankruptcy courts only have the power to impose civil contempt awards, and the contempt sanction here was punitive and criminal. To determine whether a sanction is criminal or civil, courts examine the "primary purpose" of the sanction. *Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir. 1990). If the primary purpose is "to punish the contemnor and vindicate the authority of the court," then

the sanction is criminal; but if the primary purpose is "to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation," then the order is civil. *Id*.

The contempt award against Dondero in this case is demonstrably punitive. Once the Bankruptcy Court issued the show-cause order, Highland's entire focus shifted from proving a violation of the gatekeeping order to ensuring that Dondero was found to be in contempt. The sole purpose for doing so was to vindicate the Bankruptcy Court's authority in issuing the gatekeeper order and ensuring that Dondero experienced consequences for allegedly violating it. That singular focus on punishing Dondero pervaded Highland's discovery efforts and its efforts during the contempt hearing, and it suffuses the sanctions award itself—which represented the fees incurred in those efforts. But none of those efforts were necessary to ensure that Highland was properly compensated—Highland needed no compensation, because the claimed violation of the gatekeeping order caused it no economic harm. And the sanction award was not meant to coerce compliance—an award that typically takes the form of a daily fine that ceases when the contemnor brings himself into compliance—because the Seery Motion had already been denied when Highland moved for contempt. Because the award neither compensated nor coerced compliance, it was necessarily punitive and therefore beyond the Bankruptcy Court's power to impose.

The District Court concluded otherwise simply because the Bankruptcy Court *stated* in its opinion that it "designed its award to 'compensate the Debtor'—not to mete out punishment—and based its sanctions entirely on its calculation of Highland's attorney's fees." (ROA.12269, quoting ROA.600) But "the stated purposes of the sanction … cannot be determinative" in deciding whether a sanction is civil or criminal. *Alberti v. Klevenhagen*, 46 F.3d 1347, 1359 (5th Cir. 1996) (quoting *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 828 (1994)). Rather, that decision must be based on "an examination of the character of the relief itself." *Id*. And attorney's fee awards are not *inherently* civil sanctions—they remain civil only so long as they are "wholly remedial," and can become criminal when they no longer serve that purpose. *Petroleos Mexicanos*, 826 F.2d at 399. By those standards, the award here can only be considered punitive. That is yet another reason it must be reversed.

### C.    The amount of the contempt sanction is also unreasonable.

The final reason the contempt sanction must be reversed is that it violates another axiomatic principle governing fee awards based on billable hours: Parties "seeking attorney's fees have the burden of showing the reasonableness of the hours billed and that the attorneys exercised billing judgment." *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013). Attorneys seeking reimbursement for their fees must therefore do more than merely submit fee statements showing the total amount

of fees they billed.  They must also submit some evidence of the *reasonableness* of those fees, thus enabling "a meaningful review of whether the hours claimed" were "reasonably expended." *Wegner v. Standard Insurance*, 129 F.3d 814, 823 (5th Cir. 1997) (affirming award where attorney submitted "an affidavit from legal counsel reflecting her credentials and her view that the attorney's fees on the printout were reasonable and necessary in the prosecution of the case"); *see also Payne v. Univ. of S. Miss.*, 681 F. App'x 384, 390 (5th Cir. 2017) (per curiam) (affirming fee award where party offered "multiple affidavits and a declaration" establishing "the time spent on the case" and the "reasonableness" of the fee).

None of the attorneys working for or with Highland complied with this evidentiary requirement. Highland's bankruptcy counsel provided nothing more than "invoices of the fees incurred relating to this matter," offering no affidavit, no testimony, and no other evidence indicating that the billed fees were reasonable or the product of billing judgment. (ROA.604) And even then, Highland's bankruptcy counsel provided more than the UCC's counsel and Highland's local counsel, who did not even offer invoices. (*Id.*) Yet the Bankruptcy Court awarded their fees anyway, and the District Court excused this evidentiary gap in the name of "rough justice." (ROA.12269, quoting *Roussell v. Brinker Intern., Inc.*, 441 F. App'x 222, 233 (5th Cir. 2011) (per curiam)). But no amount of "rough justice" can fill the

gaping holes in Highland's proof. And that is another reason the fee award must be reversed.

## CONCLUSION

For the reasons stated above, the Bankruptcy Court's order of contempt and sanction of $239,655 against James Dondero, and the District Court's affirmance of that order and award, should be reversed.

Respectfully submitted,

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**
jlevinger@levingerpc.com
**J. Carl Cecere (of counsel)**
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, Texas 75201
Telephone:  214-855-6817
Facsimile:  214-817-4509

*Attorneys for Appellant*
*James Dondero*

### CERTIFICATE OF SERVICE

The undersigned certifies that on February 6, 2023, the foregoing Brief of Appellant James Dondero was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Appellate CM-ECF System. Participants in this case who are registered CM-ECF users will be served electronically by the Appellate CM-ECF System. Other participants will be served by e-mail.

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

### CERTIFICATE REGARDING PRIVACY REDACTIONS AND VIRUS SCANNING

The undersigned certifies that: (1) all required privacy redactions have been made in this brief, in compliance with 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, in compliance with 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limit of FED. R. APP. P. 32 (a)(7)(B) because, excluding the parts of the brief exempted by FED. R. APP. P. 32(f):

    ☒    it contains 9,030 words.

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

    ☒    it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 pt. Times New Roman (and 13 pt. for footnotes).

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

*Attorney of Record
for Appellant James Dondero*

February 6, 2023